The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Cramer. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award. The Full Commission affirms the Opinion and Award of the deputy commissioner, with minor modifications, and further modifies the Opinion and Award to allow defendant to offset the amount due to plaintiff pursuant to G.S. § 97-31 by the attorney's fees awarded to defendant pursuant to G.S. § 97-88.1.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties through the Pre-trial Agreement and at the hearing as:
 STIPULATIONS
1. The parties are properly before the Industrial Commission and the Commission has jurisdiction of this matter.
2. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. An employee-employer relationship existed between plaintiff-employee and defendant-employer.
4. The employer Lowe's Companies, Inc., is self-insured and GAB Robins is the servicing agent.
5. Plaintiff sustained a compensable injury by accident on 16 February 1993.
6. A Form 21 agreement was entered into by the parties and approved by the Industrial Commission on 3 May 1993.
7. A Form 18 was filed by the Plaintiff on 12 December 1994.
8. A Form 24 Application to Terminate or Suspend Payment of Compensation was filed by the Defendant and dated 22 August 1996.
9. A withdrawal of Form 24 was filed by the Defendant dated 9 September 1996.
10. An Order allowing the Plaintiff's deposition was entered on 21 October 1996.
11. The deposition of Ricky Johnson was taken on 26 November 1997.
12. A Form 24 Application to Terminate or Suspend Payment of Compensation was filed by the Defendant dated 12 December 1997.
13. The Plaintiff's Response to Application to Terminate or Suspend Payment of Compensation was filed 22 December 1997.
14. The Administrative Decision and Order referring the Defendant's Form 24 Application to the docket director was filed 5 March 1998.
15. The Defendant filed a Form 33 Request that Claim be Assigned for Hearing dated 12 March 1998.
16. The Defendant filed a motion to be excused from mediated settlement conference on 14 April 1998.
17. The Commission entered an Order excusing case from mediated settlement conference 27 April 1998.
18. The Plaintiff's average weekly wage is $211.45 with a compensation rate of $140.97.
***********
The Full Commission makes the following additional:
 FINDINGS OF FACT
1. Plaintiff is a male who was born on 13 August 1953. He obtained his G.E.D. in 1978.
2. Plaintiff has worked in auto mechanics and has auto mechanic training from a community college. He has also worked in construction and at a furniture factory.
3. On 16 February 1993, plaintiff sustained an injury to his right knee when he stepped down from a forklift and twisted his knee while working for defendant.
4. Plaintiff was initially treated by Dr. John Bond. X-rays showed no bone deformity. An MRI on 3 March 1993 showed a possible torn meniscus, and Plaintiff underwent a diagnostic arthroscopy and a partial chondroplasty on 24 March 1993. The surgery showed a grade III chondromalacia, a softening of the cartilage which forms over the end of the femur, inside the knee. A grade I is least severe, and grade IV is most severe. Following the surgery, Dr. Bond referred plaintiff to physical therapy.
5. Plaintiff continued to complain of a great deal of pain and Dr. Bond kept him out of work. An MRI done on 31 May 1993 showed medial and lateral collateral ligaments within normal limits, and no meniscal or ligamentous tear. A small joint effusion was evident, slightly smaller than shown on a prior scan. In follow-up on 3 June 1993, Dr. Bond noted no evidence of a new injury and a fairly good range of motion.
6. Due to plaintiff's ongoing complaints, he was referred to Dr. Walton Curl, an orthopaedic surgeon. Dr. Curl first saw plaintiff on 13 September 1993. Dr. Curl agreed with the diagnosis of chondromalacia, grade III, of the medial femoral condyle of the right knee. Based upon plaintiff's subjective complaints, Dr. Curl was concerned about reflex sympathetic dystrophy (R.S.D.). Objective tests, including a three phase bone scan, showed plaintiff was not suffering from R.S.D.
7. On 12 October 1993, Dr. Curl performed a repeat arthroscopy. He debrided a grade III to IV chrondromalacia and excised the plicia. Following this procedure, plaintiff was again referred to physical therapy.
8. On 13 December 1993, Dr. Curl discontinued the physical therapy and released plaintiff to return to work with restrictions of no lifting over twenty pounds, no bending, no stooping, and no climbing. Dr. Curl was not familiar with plaintiff's former job with defendant. However, based upon plaintiff's subjective complaints and his representations that he could not return to that work, Dr. Curl suggested vocational rehabilitation.
9. When he saw plaintiff on 7 February 1994, Dr. Curl was of the opinion that Plaintiff was at maximum medical improvement with a thirty percent permanent impairment to his right lower extremity. Dr. Curl gave Plaintiff work restrictions of no bending, stooping, climbing and no lifting over thirty pounds. Dr. Curl's assignment of a rating and the work restrictions were based upon his objective findings from surgery as well as the plaintiff's subjective complaints.
10. Plaintiff later underwent another arthroscopy. On 27 September 1994, Dr. Curl performed a debridement of the medical plicia and lavage of the medial femoral condyle. Dr. Curl found that the medial femoral condyle had improved to a grade II to III from the growth of new cartilage over the bone.
11. Plaintiff was again sent to physical therapy. On 14 November 1994, Dr. Curl released Plaintiff from his treatment with no change in his disability rating. Plaintiff told Dr. Curl he had been working on cars, and Dr. Curl concluded that was appropriate work for plaintiff.
12. In the spring of 1994, Plaintiff began spending time at a Phillips 66 service station located on Highway 421 in Wilkes County. From time to time, he pumped gas and performed work on cars, such as changing oil. The evidence does not establish whether he was earning any wages for this work.
13. Beginning in July 1994, the employer hired a private investigator to conduct surveillance of plaintiff's activities. From that time until shortly before the hearing before the deputy commissioner, both private investigators hired by defendant and employees at defendant's business observed plaintiff engaged in activities inconsistent with his subjective complaints and in excess of the restrictions given by Dr. Curl.
14. On 27 July 1994, plaintiff was at the Phillips 66 gas station, apparently repairing vehicles. He was observed in the work bay, leaning over the engine of a Ford Mustang and with grease and oil on his hands and arms. On 3 August 1994, he was again observed working on vehicles. He was seen looking over the engine of a Ford Mustang and later he was observed working under the vehicle after it was raised on a hydraulic lift. Plaintiff appeared to move without difficulty or impairment.
15. On 16 November 1994, when plaintiff came to Lowe's to pick up his compensation check, Cynthia Core, personnel assistant, attempted to discuss a return to work with him. Plaintiff told her his doctor had released him to work if Lowe's could accommodate him. However, plaintiff did not provide a doctor's note or any list of restrictions.
16. Plaintiff returned to see Dr. Curl on 27 March 1995, with ongoing complaints about his knee. Although he found no misalignment of the knee, based upon plaintiff's subjective complaints, Dr. Curl suggested that a Generation II brace might help decompress the medial side and be of benefit. Although the brace was never ordered, it appears that plaintiff got along very well without it.
17. During March 1995, plaintiff was observed by a private investigator, Jimmy Ruark. On 30 March 1995, plaintiff appeared to be conducting personal errands, which he carried out without difficulty. Although plaintiff sometimes displayed a slight limp, he was walking without a cane or any other support.
18. Around early to mid-March 1995, Gary Holbrook, an employee at defendant's business, saw plaintiff at Wal-Mart. Plaintiff had not yet seen Mr. Holbrook, was not using a cane, and was walking without a limp. After plaintiff saw Mr. Holbrook, he began limping noticeably. About two weeks later, on 30 March 1995, when plaintiff came to pick up his workers' compensation check, Gary Holbrook and another employee, Mitchell McIntosh, observed that plaintiff was using a cane and was limping noticeably.
19. Shirley Inscore, another Lowe's employee, observed similar behavior by plaintiff. She had seen plaintiff a few times when he came to pick up his compensation check and he was using a cane and limping. During this same time period that he was seen limping at Lowe's, Ms. Inscore saw plaintiff at Blueberry Farms, a local market. Plaintiff had not yet seen Ms. Inscore and was walking towards her vehicle with no limp. After Ms. Inscore greeted him and he was aware of her presence, plaintiff started limping toward his vehicle.
20. Jimmy Ruark conducted additional surveillance on plaintiff in July, August and September 1995. On 24 July 1995, Mr. Ruark observed plaintiff getting in and out of his car and walking at a brisk pace in a fluid manner with no cane or support and in no apparent distress.
21. On 25 July 1995, Mr. Ruark observed plaintiff while he was running errands and visiting friends. Plaintiff drove his vehicle to a couple of stores and a private residence. He was observed getting in and out of his vehicle in a smooth natural manner and walking without difficulty or any support.
22. Surveillance conducted in August and September 1995 revealed similar behavior. When plaintiff was observed walking and entering and exiting his vehicle, he did so smoothly and without any apparent distress. He did not use a cane or any other support.
23. During October, November and December 1995, plaintiff was apparently performing mechanical work at a garage on Union Methodist Church Road. On at least ten occasions, Dee Mitchell, a Lowe's employee, observed plaintiff at the garage, and plaintiff appeared to be working on vehicles.
24. On 24 October 1995, Dee Mitchell drove by the garage around 11:00 a.m. and saw plaintiff and another man carrying a complete rear end housing and axle assembly into the garage. On 26 October 1995 and 31 October 1995, Mr. Mitchell saw plaintiff bending over the engine under the hood of a vehicle, apparently working on the vehicle.
25. Dee Mitchell observed plaintiff at the garage on other occasions in November and December 1995, and each time plaintiff was active and appeared to be working.
26. On 2 November 1995, Dee Mitchell observed plaintiff at the garage, squatting down almost to the ground, bending both legs. Plaintiff appeared to be working on a large car part.
27. On 27 November 1995, Dee Mitchell observed Plaintiff carrying a five gallon bucket. It appeared that the bucket was heavy because plaintiff was tilted to his right side.
28. On 13 December 1995, Mr. Mitchell saw plaintiff squatting down in front of the garage, working on a car part.
29. Plaintiff's testimony that he was not doing auto mechanic work during 1995 is not credible, particularly in light of the direct observations of other witnesses. The greater weight of the evidence establishes that during October, November, and December 1995, plaintiff was doing mechanical work on vehicles at the service station on Union Methodist Church Road. Regardless of whether he was earning wages, plaintiff demonstrated the physical capacity to perform such work during this time period.
30. Despite his demonstrated physical capabilities and the fact that he was performing auto mechanic work, plaintiff continued to complain of knee pain to Dr. Curl. As of 30 October 1995, Dr. Curl was still of the opinion that plaintiff could return to light duty work.
31. On 22 December 1995, Mitchell McIntosh, the human resource manager for the Lowe's distribution center, met with plaintiff. Mr. McIntosh suggested to plaintiff that the carrier might provide vocational rehabilitation. Plaintiff was not interested in vocational assistance. He told Mr. McIntosh that he was not working and that no one would hire him. Plaintiff produced a note from Dr. Curl dated 7 February 1994 which indicated Plaintiff had a permanent disability to his right knee. Dr. Curl's testimony makes it clear that this note did not mean that Plaintiff was totally permanently disabled, but only that plaintiff had sustained a permanent impairment to his knee.
32. In the 22 December 1995 conversation with Mr. McIntosh, as well as in other conversations with him, plaintiff would always maintain that he could not do any work due to his knee problem. Plaintiff's attitude was that he was totally disabled. Plaintiff expressed no interest in or willingness to try other work which might be available at Lowe's within the restrictions given by Dr. Curl.
33. In December 1995, plaintiff was involved in a vehicular accident at Tanglewood Park in Forsyth County. Plaintiff told Mitchell McIntosh and Cindy Core that he had injured his left knee in the accident. Plaintiff said that he could not climb the steps to pick up his compensation check, so Ms. Core took it downstairs to him. At the hearing, plaintiff testified that he hurt only his back and neck in the accident.
34. Dr. Curl was of the opinion that eventually plaintiff might need knee replacement surgery. However, Dr. Curl advised delaying as long as possible, at least ten years and preferably longer. The life span for a prosthesis is a maximum of ten years, and each replacement becomes more difficult.
35. On 1 February 1996, plaintiff was seen by Dr. Robert Saltzman, an orthopaedic specialist, for a second opinion. Dr. Saltzman assessed plaintiff with a grade II to III chondromalacia of the right knee. On physical exam, he found plaintiff could flex to 90 degrees comfortably and to 120 degrees using his hands. Plaintiff could bring his leg to full extension "with coaxing". Dr. Saltzman did not believe a knee brace would be beneficial, but that a brace might cause further damage. He recommended an intensive three week physical therapy rehabilitation program. He did not believe plaintiff was a candidate for knee replacement surgery at that time and suggested the earliest he would perform such surgery would be age 55, and preferably age 60, in agreement with Dr. Curl.
36. When plaintiff reported to the Rehabilitation Center in Charlotte for the physical therapy program, he was using crutches. When Dr. Carlton, the medical director, examined him, plaintiff lacked thirty degrees of full extension of the right leg. However, with passive maneuver, Dr. Carlton could bring the leg to nearly full extension.
37. A functional capacity evaluation at the conclusion of the physical therapy program showed plaintiff's level of function in the light category of physical demand. He could lift 20 pounds occasionally and 10 pounds or less frequently. It was noted that, although plaintiff walked with a cane, he had demonstrated that he was able to walk with a normal heel/toe gait without use of the cane for short distances.
38. In the discharge summary of 28 February 1996, Dr. Carlton noted that some of Plaintiff's efforts were inconsistent and submaximal. Although plaintiff reported several episodes of his knee giving way, none of these episodes were observed while he was in therapy. Dr. Carlton was of the opinion that plaintiff was at maximum medical improvement with a thirty percent permanent impairment of his right lower extremity.
39. Following his release from the Rehabilitation Center, Plaintiff had additional conversations with Cindy Core regarding returning to work. Plaintiff continued to tell Ms. Core that his knee was in bad shape and that he did not know if he could return to work. He continued to walk with a cane when he came to pick up his compensation checks.
40. About this same time, Michael Volin, loss prevention manager for Lowe's, had also observed plaintiff limping when he came to Lowe's to pick up his checks.
41. On 9 April, 1996, Mr. Volin was returning from lunch when he happened to see plaintiff by a small church on Highway 268. Plaintiff was in the back of a small pickup truck unloading masonry blocks such as those used in building foundations. Plaintiff was standing in the truck bed, bending over and picking up blocks and handing them to another man standing outside of the truck. Mr. Volin parked across the street and watched plaintiff for about twenty minutes, during which time plaintiff unloaded another ten to fifteen blocks.
42. On 6 June 1996, videotaped surveillance of plaintiff was conducted. Plaintiff was seen at the church building, walking and carrying a small child on his left side. Plaintiff also loaded and unloaded items from the bed of his pickup truck. He carried large plastic bags which he hefted into the bed of the truck. On that same day, he drove a man to a local hospital or medical office and loaded and unloaded what appeared to be a walker from the bed of the pickup. Plaintiff did these tasks of loading and unloading items from the truck bed with no apparent difficulty. He was able to swing these items over the side rail of the truck and did not lower the tailgate to make the task easier.
43. On 7 June 1996, plaintiff was again videotaped engaged in various activity around the church building. He removed a metal ladder from his truck bed and carried it over and leaned it against the building.
44. On 27 June 1996, plaintiff was again engaged in activities around the church building. He repeatedly bends and kneels to sort through various clothing items which apparently have been left at the church. Plaintiff repeatedly lifts large bags and boxes of clothing from the ground and up into his truck bed. Plaintiff is also involved in securing a large blue plastic tarp onto a wooden frame. Plaintiff climbed a ladder and reached overhead to pull and hammer the tarp into place.
45. On 28 June 1996, plaintiff was again videotaped, from approximately 9:12 a.m. until 2:56 p.m. From approximately 10 a.m. until 11:22 a.m,. plaintiff was involved in shoveling a pile of sand or dirt. From approximately 12:50 p.m. until the video surveillance was terminated at 2:56 p.m., Plaintiff appeared to be involved in a thrift sale at his church. Plaintiff was seen carrying and moving armloads of clothing and large boxes. Some of these boxes appeared to be heavy.
46. On 16 July 1996, when he came to Lowe's to pick up his compensation check, Plaintiff told Cindy Core that he was sore because he had been cutting firewood and helping clear some land.
47. In a deposition taken 20 September 1996, plaintiff testified that he could not crouch, kneel or squat, and could not do any heavy lifting or stand more that twenty minutes. He claimed he could only climb a ladder if he did so slowly, and that he could not do any construction work. Plaintiff testified that his knee had gotten worse in the past few months and that he had not been able to work since his knee injury. He made it clear that he was not interested in vocational training. Plaintiff's testimony about his abilities was clearly contradicted by eyewitness testimony and surveillance videotapes.
48. Plaintiff returned to see Dr. Curl on 22 September 1997 and complained of increasing problems with his knee locking, giving way and having tenderness. Dr. Curl, upon examination, found no evidence of swelling or locking, and concluded that the knee was stable.
49. During October 1997, plaintiff assisted Doug Williams, a friend of plaintiff's sister, in a logging operation on Bear Hollow Road in Wilkes County. Plaintiff's activities on 30 October 1997 were observed for over four hours and videotaped by Ken Whapham, a private investigator. During this time period, plaintiff was walking through the woods and using a chain saw repeatedly to cut the trees which were on the ground. Plaintiff also wrapped a chain around the trees so the bulldozer could pull it out. Plaintiff worked continuously without a break, except for a few minutes when he was servicing the chainsaw, putting gas or oil into it. Several times plaintiff pushed or kicked logs. During this work, plaintiff showed no signs of distress.
50. Plaintiff worked logging at the Bear Hollow location about twelve different times during October and November 1997. Plaintiff received about $200 from Doug Williams for this work. At the hearing, Mr. Williams said that this was reimbursement for plaintiff's expenses.
51. Plaintiff last saw Dr. Curl on 10 November 1997, at which time he complained of tenderness. Plaintiff did not report any of his logging activities to Dr. Curl. Dr. Curl gave him a prescription for Darvocet and released him from further treatment.
52. At his deposition taken on 24 September 1998, Dr. Curl had an opportunity to view the videotape of Plaintiff's logging activities on 30 October 1997. These activities included prolonged standing and walking, stooping, kneeling, and many motions which plaintiff contended that he could not perform. Dr. Curl observed that plaintiff could flex his right leg more than 90 degrees for several minutes, contrary to plaintiff's behavior exhibited during Dr. Curl's examinations. Plaintiff also walked with a heel-toe gait which was contrary to what Dr. Curl had observed during examinations.
53. Dr. Curl, after viewing the videotape, expressed his opinion that these activities exceeded the definition of light duty work and exceeded the plaintiff's restrictions. Based upon plaintiff's subjective presentation, Dr. Curl would not have thought plaintiff capable of performing the activities portrayed on the videotape.
54. Ray Young, an investigator with the Industrial Commission investigated this matter. The fraud screening committee presented this case to the district attorney. Criminal warrants were issued against plaintiff for fraudulently obtaining workers' compensation benefits and for perjury. A probable cause hearing was held and the criminal matter was bound over to superior court. A grand jury returned a true bill of indictment. The criminal matter has not yet gone to trial.
55. Following the criminal indictment of plaintiff on 10 December 1997, defendant suspended payment of benefits without authorization from the Commission.
56. Plaintiff has consistently misrepresented his knee condition and his physical capacity to work to his health care providers, including Dr. Curl, and his employer. Plaintiff's claim that he is unable to work due to his knee condition is contradicted by convincing eyewitness testimony and videotaped evidence of his activities. Plaintiff's testimony regarding his knee condition is not credible. Plaintiff has exhibited a pattern of deceptive behavior.
57. Regardless of whether he has been paid or earned wages for his labor, plaintiff has repeatedly demonstrated the capacity to engage in activities through which he could earn wages. He is able to work as an auto mechanic. He is able to work in logging. He is capable of standing, walking, kneeling, stooping and bending on a continuous basis. He is also capable of lifting more than just a light load, or more than 30 pounds on an occasional basis.
58. Plaintiff has made no effort to cooperate with Lowe's efforts to find suitable work. He has made it clear that offers of vocational assistance would be refused.
59. Plaintiff is not entitled to total disability benefits after 30 October 1997.
60. The sustained activity depicted on the videotape of 30 October 1997, as well as plaintiff's prior activity which was witnessed or videotaped in 1995 and 1996, indicates that plaintiff likely was able to earn wages long before 30 October 1997. Clearly, as of 30 October 1997, plaintiff demonstrated the physical capacity to engage in suitable employment.
61. Plaintiff's defense of defendant's Form 24 Application to terminate benefits was without reasonable ground.
62. As a result of plaintiff's unreasonable defense of the Form 24 Application, defendant has incurred reasonable attorney's fees in the amount of $6,766.50. Defendant is entitled to offset this amount against any amount due plaintiff.
63. Plaintiff has a permanent impairment of thirty percent to his right leg for which he is entitled to compensation. Defendant is entitled to a credit against any such payment for the overpayment of temporary total benefits from 30 October 1997 until 12 December 1997.
***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On 16 February 1993, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant, resulting in injury to plaintiff's right knee. G.S. § 97-2(6).
2. Defendant accepted liability through a Form 21 Agreement and has paid all necessary medical expenses as well as all total disability compensation which is due. G.S. §§ 97-2(19), 97-25,97-29.
3. Defendant has rebutted the presumption of ongoing disability arising from the Form 21 Agreement. The evidence convincingly establishes that as of 30 October 1997, plaintiff had the capacity to earn wages in gainful and suitable employment. G.S. §97-29; Stone v. G G Builders, 346 N.C. 154, (1997).
4. Plaintiff is entitled to sixty weeks of benefits for his thirty (30) percent permanent impairment to his right leg. G.S. §97-31(15).
5. Defendant is entitled to a credit for overpayment of total disability benefits. G.S. § 97-29.
6. Defendant is entitled to attorney's fees incurred as a result of plaintiff's unfounded litigiousness. Defendant is entitled to offset benefits owed to plaintiff under G.S. § 97-31
by the attorney's fees awarded to defendant. G.S. § 97-88.1.
***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall continue to pay any medical bills which may be incurred by plaintiff for reasonably necessary medical treatment. Due primarily to the fact that plaintiff may need knee reconstruction surgery 10 to 20 years in the future, plaintiff is entitled to ongoing medical treatment.
2. Defendant shall pay plaintiff compensation at the rate of $140.97 for sixty weeks for his thirty percent permanent impairment to his right leg. Such payments are to begin as of 30 October 1997 and are subject to a credit for overpayment of temporary total disability benefits from 30 October 1997 to 12 December 1997, and subject to a credit to defendant for attorney's fees assessed in paragraph 3 below.
3. Plaintiff is assessed and shall pay to Defendant an attorney's fee of $6,766.50, pursuant to G.S. § 97-88.1.
4. Each side shall pay its own costs.
S/_____________ RENEE C. RIGGSBEE COMMISSIONER
CONCURRING:
S/_____________ DIANNE C. SELLERS COMMISSIONER